THE BRUSH ELECTRIC ILLUMINATING COMPANY, APPELLANT, *v.* THE CONSOLIDATED TELEGRAPH AND ELECTRICAL SUB-WAY COMPANY, RESPONDENT.

*Electrical sub-ways in New York city — the occupation of a sub-way by a corporation binds it to pay the rent fixed — equitable relief not granted where a legal remedy exists — relief as to the past rent — the power of the court limited to that conferred by section 7, chapter 716, Laws of 1887 — eviction of corporations using the electrical sub-ways.*

By chapter 534, Laws of 1884, the legislature directed that all telegraphic, telephonic and electric light wires should, in cities having a population of 500,000 or over, be placed under ground, and, by chapter 499, Laws of 1885, created, in cities having a population exceeding 1,000,000, a board of commissioners of electrical sub-ways, to build such sub-ways for all corporations of that nature. Such a board, in 1886 in the city of New York, entered into a contract with a sub-way company for such construction, and in April, 1887, a further modified contract was made; this permitted the defendant "to fix a fair scale of rent," but provided that the scale of rentals should, at all times, be subject to the control of said board, to which any dispute in this regard should be referred for final decision.

Said contract, as modified, was confirmed by chapter 716, Laws of 1887, section 7 of which provided that if it should be made to appear to the satisfaction of any of the justices of the Supreme Court, or of any judge of the Common Pleas or of the Superior Court, or to the satisfaction of either of said courts, that the said board or the said sub-way company had violated or failed to perform any of the provisions of the acts above cited or of said agreement, or had failed to furnish to corporations desiring to use the sub-ways just and equal facilities "upon terms that to the court shall appear just and reasonable," then said judge or justice or court might, by "proper proceedings in the nature of a writ of *mandamus,* or by *mandamus,*" enforce the provisions of said acts and of said agreement, or compel the granting of such facilities.

In 1888, the sub-way company completed certain sub-ways and announced a tariff, which was known to an electric illuminating company which applied for and obtained space in such sub-ways. After paying a small part of the rent, the illuminating company declared the same unreasonable and refused to make any further payment. The sub-way company subsequently notified the illuminating company that unless payment was made it would remove from the subways the latter's apparatus. The illuminating company then brought an action in order to have a fair scale of rentals determined by the court, and asked that all action on the part of the sub-way company, the defendant therein, be in the meantime stayed.

Upon a motion made to continue a preliminary injunction during the pendency of the action:

*Held,* that the motion should be denied.

That the occupancy of the sub-ways by the plaintiff, with knowledge of the rental demanded, constituted a contract with the defendant to pay that rental.

That if the plaintiff deemed the rent as fixed unreasonable, it was its duty under chapter 716, Laws of 1887, to have first submitted the question to the arbiter appointed by said statute, to wit, the Board of Commissioners of Electrical Sub-ways.

That in the absence of fraud the decision of said board would, it seems, be final.

That in any event equity could not be invoked by a company which was in default, and which had not paid or secured the payment of the rent which it knew was asked by the defendant.

That neither equity nor section 7 of chapter 716, Laws of 1887, could relieve the plaintiff in regard to rent which had become due before the commencement of the action.

That no general jurisdiction was conferred by said section 7 of chapter 716 of the Laws of 1887 upon the court as a court of equity; and that the remedy there given, by *mandamus*, or proceedings in that nature, must be strictly pursued.

That under said section 7 the court had power to do only such acts as, under its provisions, a judge could do out of court.

That the defendant had a right to resort to the remedy of eviction upon the failure of the plaintiff to pay the rentals announced by the defendant.

APPEAL by the plaintiff, the Brush Electric Illuminating Company, from an order entered in the clerk's office of the county of New York on the 5th day of June, 1891, denying its motion to continue an injunction heretofore granted in this action, restraining the defendant, its officers, attorneys, agents and servants from removing, or in any way whatsoever interfering with, the cables and electrical conductors or any property of the plaintiff, and from interfering with the plaintiff, its officers, agents or servants in operating and maintaining said cables or conductors, or having access to them, or any of the plaintiff's property, in the defendant's sub-way, constructed or to be constructed, and from instituting or prosecuting any action or proceeding for the purpose of removing from said sub-way, or otherwise interfering with, the property of the plaintiff; and also vacating the temporary injunction.

*Esek Cowen, W. P. Putney, B. F. Einstein* and *Paul D. Cravath*, for the appellant.

*J. C. Carter, F. R. Coudert, Edward Lauterbach, M. Egleston* and *W. N. Cohen*, for the respondent.

VAN BRUNT, P. J.:

The plaintiff in this action, together with the plaintiffs in the other actions argued herewith, were duly incorporated for the purpose of the manufacture, use and transmission of electricity for the production of heat, light and power in the city of New York, and for a long period of time maintained poles and wires and other conductors in the streets of the city by which their currents were transmitted and distributed. Prior to the year 1887 overhead wires were exclusively used by these corporations.

In 1884 the Legislature passed an act which provided that all telegraphic, telephonic and electric-light wires and cables used in any incorporated city of this State, having a population of 500,000 or over, should thereafter be placed under the surface of the streets, lanes and avenues of the city.

In 1885 an act was passed by which in cities having a population exceeding a million, the mayor, comptroller and commissioner of public works of such city were authorized and directed to appoint three disinterested persons who were to be a board of commissioners of electrical sub-ways, which board was charged with the responsibility of enforcing the provisions of the act of 1884, hereinbefore mentioned, and of causing to be removed from the surface and to be maintained and operated underground wherever practicable, all electric wires and cables used or to be used in the business in any such city. Under this act it was contemplated that the electric-light companies should build the sub-ways according to plans to be submitted to the said board of commissioners; and in case of the failure of said companies to propose or put in use a suitable plan, the commissioners were directed to devise and make a general plan such as would meet the requirements of the acts of the Legislature. In 1886 the act in question was amended in some immaterial particulars. In the said year the board of commissioners of sub-ways which had been duly appointed pursuant to the act of 1885 for the purpose of carrying into effect the duties imposed upon them by that act, entered into a contract with the Consolidated Telegraph and Electrical Sub-way Company (the respondent) for the construction of the sub-ways into which the overhead electric wires were to be put. In April, 1887, the said commissioners entered into another contract with said respondent, whereby they agreed to provide,

build, equip, maintain and operate sub-ways according to plans and specifications furnished therefor by the commissioners of sub-ways or their successors.

The fifth paragraph of said contract reads as follows : " The party of the second part (the respondent) may fix a fair scale of rent to be charged according to the kind of conductors and the amount of space required therefor, which shall be at the same rate to all occupants making a like use of said sub-ways ; but the scale of rentals or any charges fixed or made by the party of the second part (the respondent) shall at all times be subject to the control, modification and revision of the parties of the first part (the commissioners of sub-ways), or their successors ; and no contract shall be made between the party of the second part and any company or corporation on any terms which shall not require the payment by such other company or corporation of rents at the rates so fixed."

The tenth paragraph of said contract reads as follows : " In case any dispute shall arise between the party of the second part (the respondent) and any company occupying or desiring or requiring to occupy said sub-ways, the same shall be referred to the parties of the first part, or their successors, for settlement, whose decision shall be final."

In June. 1887, the legislature passed an act by which the agreement made between the commissioners of sub-ways for the city of New York and the Consolidated Telegraph and Electrical Sub-way Company, under date of July 26, 1886, as amended and modified by a second and further contract or agreement between said parties, dated the 7th of April, 1887, was ratified and confirmed, subject, however, to the provisions of that act.

Section 7 of the act reads as follows :

§ 7. In case and whenever it shall be made to appear to the satisfaction of any of the justices of the Supreme Court, or any judge of the Court of Common Pleas in and for the city and county of New York, or any judge of the Superior Court of the city of New York, or to the satisfaction of either of said courts, that the said board constituted by this act, or its successors, or any officer or agent of said board, or its successors, or the said The Consolidated Telegraph and Electrical Sub-way Company, or any corporation or persons

claiming under the said board or its successors, or under the said company, shall have violated or shall have failed to observe and fully perform or to carry into full effect all or any of the provisions of this act or of either of the acts hereinbefore mentioned, or of the said agreement, or shall have failed to furnish just and equal facilities under this act or the said agreement to any and all corporations lawfully competent to manufacture, use or supply electricity, or to operate electrical conductors in any street, avenue or highway in the city of New York applying for such facilities upon terms that to the court shall appear just and reasonable, then and in every such case said judge or justice or court may, by proper proceedings in the nature of a writ of *mandamus,* or by *mandamus,* enforce the provisions of this act or of the acts before mentioned, or of the said agreements, or of any agreement made under the said acts, or compel the granting of such facilities, or may grant such relief as may be proper in the premises. And the said board or its successors, or the mayor, aldermen and commonalty of the city of New York, or any person, company or corporation aggrieved by any such violation or failure as aforesaid, shall be entitled to institute and maintain such proceedings as are by this section authorized."

The defendant, having completed a large number of miles of sub-ways in 1888, announced a tariff which would be charged the electric-light companies for the use of the sub-ways, and, in 1889, applications were made by various of the electric-light companies for space in the sub-ways for the period of one year, some of which applications contained the rental inserted therein, and in others the rental was left blank; but all the electric-light companies making this application knew the scale of rent which the defendant had adopted for the use of the sub-ways constructed by them. These applications having been granted by the defendant, and space assigned in the sub-ways to these various electric-light companies, they proceeded to put their wires therein and use the same for the purposes of their business. It further appears that these companies protested against the rates which were charged by the defendant for the use of its sub-ways, upon the ground that they were unjust, unreasonable and not fair; and negotiations were had between the defendant and some of these electric-light companies for a reduction of these rentals, such negotiations, however, being predicated upon

an occupation of the sub-ways by the electric-light companies for a series of years. Some slight portion of the rental thus claimed by the defendant has been paid, but for a long period of time, prior to the commencement of these actions, there had been a refusal upon the part of the electric-light companies to pay any rent to the defendant, upon the ground that the rent demanded was unfair. In October, 1890, the defendant notified the electric-light companies that they were required to pay the rentals due or else to take out and remove their cables and electrical conductors from the sub-ways, and, in case of failure to comply with the requirements of the notice upon a certain date, measures would be taken by the defendant for the removal or cutting out or both of the cables and conductors belonging to the electric-light companies from the sub-ways owned by the defendant. Thereupon these actions were commenced and injunctions were obtained to restrain action upon the part of the defendant. Upon the hearing of the motion to make the injunction permanent during the pendency of the action, the motion was denied, and from such denial this appeal is taken.

The plaintiff, claiming that the rental charged by the defendant is unjust and unreasonable, has brought this action to have a fair scale of rentals determined by the court, all action upon the part of the defendant towards the collection of any rent whatever to be enjoined, pending the investigation of this question.

The plaintiff invokes the jurisdiction of the court upon the ground that the contracts hereinbefore mentioned provide that the defendant may fix a fair scale of rents, and upon the claim that section 7 of the act of 1887, above cited, provides that the electric-light companies may occupy ducts in these sub-ways upon terms that to the court may appear just and reasonable.

It seems to be clear, under the elementary principles which determine whether contractual relations have been entered into between parties, that the application of these electric-light companies for space in the sub-ways, with knowledge of the rental which was claimed to be charged, the granting of these applications and the occupation of the sub-ways constituted a contract between the companies and the defendant to pay such rentals, unless there is something which is peculiar in the situation of the parties which takes their action out of the ordinary rules governing the conduct of

parties to contracts. It is not necessary to cite authorities for the proposition, that if A. desires B to let him the use of anything which belongs to B, and he knows B's price for such occupation, and his application being granted, he enters into such occupation, it makes a contract to pay the price.

But it is said that the electric-light companies, the plaintiffs in these actions, are not governed by this rule, because they were compelled to get out of the streets and go into the sub-ways. This is undoubtedly true. This court knows from the previous struggles of these electric-light companies which have come before it, to keep out of the sub-ways and to conduct their business (notwithstanding that it had become a public nuisance) by the use of overhead wires, that it was not until they were threatened with the destruction of their business if they continued to maintain a nuisance in the streets that they consented to occupy any portion of the sub-ways which have been prepared for them. And it is also true that a very large part of that reluctance arose from the fact that it would necessarily be more expensive to use an artificial envelope for their conductors than to allow them to be surrounded by the open air. Having resisted the law to the very last moment it may be that they were compelled to enter these sub-ways rather precipitously. But for this the defendant was not responsible, and if any harsh or unfair contract was insisted upon, under the circumstances, by the defendant, the plaintiffs had their appeal, because the scale of rents or any charge fixed or made by the defendant was at all times subject to the control, modification and revision of the Board of Electrical Control or their successors, and if the terms of the contract which had been entered into between the defendant and the electric-light companies were of such a character as required modification, an appeal was given to the Board of Electrical Control, and with but one exception, as far as we can see from the papers, no such rights were ever exercised.

But these parties, without paying or offering to pay any rental whatever, have come into a court of equity to have this rental fixed, upon the ground that it is unreasonable, without any resort whatever to the tribunal which had the power to modify the terms of the contract entered into between them and the defendant.

It is a familiar principle that, at least until all measures which the

law gives to a party have been exhausted to restrain a wrong, equity cannot be called upon to interfere. And it may well be doubted in a case of this description, where the provisions of the law (because these contracts have become law by being adopted and approved by the legislature), state that the decision of the board shall be final, whether equity can interfere unless upon proof of fraud upon the part of the board.

But it is urged that under section 7 of the act of 1887, to which reference has already been had, notwithstanding this provision of the contract, jurisdiction has been conferred upon the courts to determine and fix what is a fair and reasonable rental or to grant such relief as may be proper in case such jurisdiction is invoked.

An examination of the section, however, will show that the court as a court of equity, has no jurisdiction conferred upon it. The whole jurisdiction conferred by that section is conferred upon a justice of the Supreme Court or a judge of the Court of Common Pleas or Superior Court, or upon either of those courts, to enforce, in a particular way, the provisions of the various acts and the various agreements under said acts, and to compel the granting of such facilities and the granting of such relief as might be proper in the premises; and this way pointed out is, by proper proceedings, in the nature of a writ of *mandamus* or by *mandamus*, and no other jurisdiction whatever is conferred.

It is apparent that no general equity jurisdiction was intended to be conferred, because the jurisdiction conferred by this act may be exercised by a justice or a judge, and need not be by the court at all. It is true that the court may act, but the court has no power to do anything more than a judge would have the right to do out of court under the provisions of this act. And that this is the true interpretation placed upon this act is apparent from the last clause thereof, which is as follows: "And the said board or its successors, or the mayor, aldermen and commonalty of the city of New York, or any person, company or corporation aggrieved by any such violation or failure as aforesaid, shall be entitled to institute and maintain *such proceedings as are by this section authorized.*" As has been before seen, the only proceedings authorized by this section are proceedings in the nature of a writ of *mandamus*. Even though, therefore, a judge or a court might, where proceed-

ings in the nature of a *mandamus* had been instituted, grant such relief as the circumstances required, the very wording of the section excludes all other jurisdiction upon the part of a court or judge.

Again, even if a court of equity had jurisdiction, yet it could not intervene in an action of this character because of the position of the plaintiff. It alleges that the rental is unfair, but it has entered into a contract to pay this rental, and it is clear that no matter what the jurisdiction of the court may be as to rentals accruing subsequent to the filing of a bill, it would have no power to relieve the company from a debt which it has incurred prior to the initiation of these proceedings. It was bound to pay what was due before it could come into a court of equity and ask to be relieved from subsequent payment, even if the court had jurisdiction to entertain such an application, which we do not think it has. But in the case at bar it offers to pay nothing; it brings no money into court and is seeking to be relieved from a debt which it owes to this defendant, by the intervention of this court, upon the theory that it made a contract which it was improvident for it to make; and that, being compelled by the force of circumstances and the fear that its business might be destroyed, to make this contract, it ought not to be held to it. We know of no rule of equity jurisprudence which justifies a court in intervening under such circumstances. But it is claimed that even if there had been a valid agreement upon the part of the plaintiff to pay rentals at the rate charged, its failure to pay would not justify the defendant in its threatened conduct.

It is conceded that the letting of these sub-ways is not leasing an interest in real estate, and, therefore, under no circumstances could a possessory action to recover possession of the space occupied by these electric-light companies as real estate be maintained. And it is clear that a possessory action for the recovery of personal property will not lie, as replevin could not be had to recover a hole in the ground.

The nature of the rights conferred upon this plaintiff by the contract which it entered into with the defendant is peculiar, because of the situation of the parties and the thing leased and the purpose for which it is rented. The fact, however, that the thing rented can neither be considered real estate nor personal estate cannot deprive the defendant of the protection of the law in the

use of its property as against one who has entered upon its enjoyment under a contract which it has willfully violated.

As has already been stated, under these circumstances equity will not intervene, because the proposed action of the defendant would, at most, be a trespass, the damages for which might be easily ascertained. As far as the interruption of the business of the plaintiff is concerned, that could not be considered, because it has no right in equity to continue its business at the expense of the defendant.

The position taken by the counsel for the appellant, upon the argument of this appeal, was, that the only remedy of the defendant was to sue for the amount of these rents, and in case the occupants of the sub-ways failed and the amount could not be collected upon execution, in the case of a corporation, to have the corporation dissolved, and to have a receiver occupy the sub-ways during the pendency of the dissolution proceedings, with the right of the purchaser from the receiver to continue the occupation, and so on *ad infinitum* without a cent of rent being paid. Such a result never could receive the sanction of law, and unless the court is pointed to some plain, well-established principle which necessarily brings about such a result, it would hesitate before it interfered under such circumstances.

It might well be claimed that the rights of this defendant, in reference to the occupation of its sub-ways by the plaintiff, is similar to the right of a passenger to occupy a place in the train of a common carrier. It is well established, both at common law and by statute, that a common carrier has the right to eject a passenger who refuses to pay his fare. And, for the same reason, it would seem that when the plaintiff refuses to pay the compensation which it agreed to pay for the occupation of these sub-ways, the defendant would have a right to eject it from the vehicles in which it had been allowed to place its wires for the purpose of the conduct of its business. The position of the plaintiff in the conduct of its business by means of these sub-ways, by and with the consent of the defendant, seems to be like that of a licensee. It is permitted to conduct its business through this space over which the defendant has control, upon a promise to pay a certain remuneration. Failing to comply with its contract upon which the permit depended, the

right to continue to conduct its business by means of these sub-ways necessarily ended, and the defendant had a right to prevent its continuance.

We are of opinion, therefore, that a court of equity could not intervene, certainly until this plaintiff has paid what was due before the commencement of these proceedings, and that probably the sole jurisdiction of the court is controlled by section 7 of the act of 1887, and can be invoked only in the form of the proceedings therein prescribed in a proper case.

The order should be affirmed, with costs.

Barrett, J.:

While unreservedly concurring in the result arrived at by the presiding justice in this case, and in the other cases presented at the same time, I prefer to state briefly the conclusions at which I have arrived. These actions proceed upon the theory that the plaintiffs obtained access to certain allotted ducts in the defendant's sub-way without having made any valid or binding contract as to rent, and they ask the court to determine what would be a just and reasonable rent. In the meantime they ask us to enjoin the defendant from disturbing them, and in the end to enjoin the defendant from collecting any greater sum as rental than the sum finally adjudged in these actions to be just and reasonable. Thus, without alleging what would be a just and reasonable rent, without furnishing a particle of proof upon that head, without giving any reason for the absence of either such allegation or proof, and without tendering or even offering to bring into court any given sum deemed by them to be just and reasonable, the plaintiffs ask us to grant an injunction which will permit their continued occupancy of the allotted ducts, without one penny of immediate compensation to the defendant. What, in fact, do they offer pending this litigation? Nothing whatever but a phrase. They say in their complaints that they "have always been ready and willing to pay to the defendant a fair and just and reasonable rental for these ducts." In plain terms, therefore, the plaintiffs, in the name of equity, invoke a positive abuse of judicial power. Having secured possession of the ducts without any contract as to rent, they boldly ask us to keep them there *pendente lite* in the full and complete enjoyment of all

the rights and privileges of tenancy, freed from any of its corresponding duties or obligations. Upon the plaintiffs' own complaint, therefore, there was not a particle of equity in the application which was denied. If there was no contract, the plaintiffs were in possession as bare licensees, and upon their refusal, after due notice to remove, they became trespassers. This view of the true relation of the parties is not affected in the least by the fact that, under the legislation confirming the contract between the commissioners of electrical sub-ways and the defendant, the plaintiffs had an undoubted right to the due allotment of necessary space in the sub-ways. But the further claim made by the plaintiffs, that such right was absolute and could not be preliminarily conditioned upon reasonable terms and regulations, is, in my judgment, preposterous. The time to settle the question of rent and all other terms was when the plaintiffs applied for space. The defendant had a perfect right, and, indeed, it was its duty, to refuse to permit any company to occupy the sub-ways until the contract therefor was complete. The law is sufficiently explicit in this regard. The defendant could fix what it deemed a fair scale of rentals, and if the companies agreed to that scale, well and good. That settled the question.

If, however, the companies deemed such scale to be unfair or unreasonable, an arbiter between them and the defendant was provided, namely, the Board of Electrical Control. That board had full revisory power with regard to such rentals, and in the absence of fraud or bad faith its decision was final and binding upon both parties. It is entirely clear that the plaintiffs were bound in the first instance to appeal to this board in case the rates fixed by the defendant were deemed unreasonable. It is equally clear that the court could not revise or reverse the honest judgment of that board, and that the companies could not appeal to the court, even after an unsuccessful appeal to the board, without averring fraud or bad faith. In case, however, the board should refuse or neglect to act promptly upon the companies' appeal, a summary remedy was provided by section 7 of the act of 1887. The object of the provisions of this latter section was to secure the granting of just and equal facilities, upon fair and reasonable terms, to all applicants alike. The plaintiffs, however, neither appealed to the

board to revise the rentals fixed by the defendant, nor to the court to proceed by *mandamus* under this section 7. They simply took possession of the allotted space under written applications, some of which specified the rentals and others did not. In the latter instances it is, however, conceded that the companies were aware of the rates of rentals which the defendant had fixed. I agree with the presiding justice that the facts are sufficient to establish a contract relation between the companies and the defendant as to these rentals. The plaintiffs, however, were not even then without redress. They could still appeal to the Board of Electrical Control, which was authorized *at all times* to control, modify and revise either the scale of rentals or any fixed charges. While such appeal is afforded to them they cannot, I repeat, appeal to the courts. Certainly not, as already pointed out, without showing fraud or bad faith on the part of the board. If, therefore, the plaintiffs are in possession without a contract, the defendant has a perfect right to treat them as licensees and to remit them to their original position as outside applicants in quest of possession. If, however, they are in possession under a contract, they must abide by its terms or seek its modification in the only manner authorized by law. They cannot come into court and ask to be upheld in their naked possession until at some future time, and by means of an investigation utterly unknown to any court, whether of law or equity, " the fair thing," so to speak, between the parties has been arrived at.

With regard to the question as to whether the defendant can, under any circumstances, resort to the remedy of eviction, I think the plaintiffs must be held to the position assumed in their complaints. They do not admit the tenancy under a completed lease, but simply claim that they are in possession under an implied agreement to give them a lease upon fair and reasonable terms to be judicially ascertained. Thus their attitude in the interim, as we have already seen, is necessarily that of licensees. They are in possession, they say, without a contract, under the right, however, which the law gives them, and the duty which the law imposes upon them, to place their conductors in the sub-way. Still, they are there as mere licensees until a contract, such as the law authorizes and even compels the defendant to impose, is entered into. Upon

the case made by the plaintiffs, therefore, there can be no doubt of the defendant's right to remove an apparatus which simply trespasses upon the sub-ways. But I agree with the presiding justice that, even upon the defendant's case of a completed contract, the right exists to remove the plaintiffs' apparatus for non-payment of the agreed rentals. When the nature and object of the sub-ways are considered, it becomes apparent that the ordinary rules which govern as between landlord and tenant can have no application. The sub-way is a great public work, authorized for a specific purpose and constructed with a view to a special service. It stands to reason that when the conditions upon which the service is granted have been broken, such service may be discontinued and the facilities afforded by the structure withdrawn. To limit the defendant to the ordinary action to recover money would be subversive of the entire system thus inaugurated. Supposed analogies with regard to possessory actions are misleading. For the defendant, though a private corporation, has here public duties to perform, duties which require that it should grant or withhold the service under reasonable rules and regulations — never, of course, arbitrarily. It is, for instance, bound to supply the city of New York and each of its several departments, free of charge, with all the space necessary for their electrical conductors. It is also bound to economize the space in the sub-way so that no one company shall occupy more than it actually needs to the exclusion or detriment of any other company. It is further bound to charge the same rates to all occupants making a like use of the sub-ways. Again, when its net annual profits exceed ten per cent upon the actual cash capital invested by it in constructing and equipping the sub-ways, the excess is required to be paid into the treasury of the city of New York. Then, too, the management and control of the spaces occupied by any company is subject to the rights of all other occupants, and expressly to such reasonable rules and regulations as the defendant may make. Other provisions might be adverted to, but I have specified enough to show the *quasi* public character of the duties imposed upon the defendant, and the necessity, if it is to perform its functions successfully, of regulating the space under its control in such a manner that no one non-paying company shall have the right of permanent occupancy and continuous service to

the detriment not only of the city and the defendant, but of others who are willing to pay and who may thus be crowded out by a non-paying occupant.

I think, therefore, that payment of the agreed or fixed rentals is an essential and reasonable condition to the use of the allotted space, and that the defendant should not be interfered with in resuming possession of such space, and again offering it for electrical purposes, except in a case of real oppression and injustice. No such case has here been made out. On the contrary, an injunction under the circumstances disclosed would plainly be both unjust and oppressive.

I concur, therefore, for these reasons, in the affirmance of the orders appealed from.

Patterson, J. :

I have but little to add to the opinion of the presiding justice which covers the material points discussed on the argument of this appeal. The several plaintiffs entered into the occupation of space in the conduits of the defendant under an absolute obligation to pay for their use. That they were compelled to do so by law cannot affect that obligation, for such compulsion resulted from a necessity connected with the public safety; their business, as theretofore conducted, being dangerous to the community. At the time they entered into the occupation of the space referred to they knew not only that they were required to pay, but also the rates established. Under such circumstances an implied contract arose to pay that rent unless a different one were fixed by the tribunal created by the law to regulate rentals, which, as I read the statute and the contracts, is, in the first instance, the Board of Electrical Control. Even assuming that this court or a justice thereof, or the judges of the Court of Common Pleas or of the Superior Court, have, under the seventh section of the act of 1887, a right to fix rents under any circumstances, I do not think that provision can be construed as being retroactive or as relating to anything more than the fixing of rents after the jurisdiction has been invoked; for it is not to be assumed that the court can control or administer this property of the defendant, or interfere with past relations between it and the plaintiffs as to an adjustment of rents, any more than it could

between private parties who had entered into contract relations from which an implication of law would arise as to an amount of rent to be paid for the use or occupation of property; and it is entirely immaterial how this sub-way may be catalogued as property, or whether the relation of landlord and tenant exists, or the defendant is to be regarded as a carrier furnishing facilities for transportation, or whether it is to receive rent *eo nomine* (which the statute distinctly provides for), or a sum of money as compensation. Whatever it may be called, the defendant is entitled to its recompense, and that is for services rendered and facilities afforded; and it is simply impossible that a construction can be given to these acts which would enable the plaintiffs to go on, from year to year, using the sub-way in their business, with dilatory proceedings in courts, by appeals from adjudications fixing rates; and then, if they are dissatisfied, abandoning the use and leaving the defendant to nothing but mere common-law actions.

I agree with the presiding justice that whatever power the court may have over the subject is limited by the statute, but if general equity rules are applicable, the plaintiffs must put themselves in a position to show they are entitled to the consideration of a court of equity. That can be done only by securing to the defendant, either by a deposit of money or by a sufficient bond, the amount of rent which they knew was charged at the time they entered into occupation, which was either $1,000 a mile as fixed by the defendant, or $900 a mile, which seems to have been considered by the Board of Electrical Control a proper sum. Nothing whatever has been done by either of the plaintiffs in that direction, and the court will not now make any order concerning it, for the case must be determined on the facts as they are presented in the record, and were submitted to the judge in the court below.

We are not called upon to interfere with the course of the defendant, nor to point out to either party what is the remedy for the non-payment of this rent. It is sufficient that no case has been made for the interference of the court by injunction, and if the defendant transcends its legal right in preventing the use of the sub-ways by the plaintiffs, the latter have their adequate remedy at law.

Order affirmed with costs.