CONCETTA R. ALESI, as Administratrix of the Estate of IGNAZIO R. ALESI, Deceased, Appellant-Respondent, v. CITY OF NEW YORK, Respondent-Appellant; CONSOLIDATED EDISON COMPANY OF NEW YORK, Appellant-Respondent, and NEW YORK TELEPHONE COMPANY, Respondent.

CITY OF NEW YORK, Third-Party Plaintiff-Appellant, v. EMPIRE CITY SUBWAY COMPANY (LIMITED), Third-Party Defendant-Respondent.

CONSOLIDATED EDISON COMPANY OF NEW YORK, INC., Third-Party Plaintiff-Appellant, v. EMPIRE CITY SUBWAY COMPANY (LIMITED), Third-Party Defendant-Respondent.

First Department, November 17, 1959.

*Benjamin Adler* of counsel (*Gustave G. Rosenberg* with him on the brief; *Gustave G. Rosenberg* and *Lawrence M. Rosenberg,* attorneys), for administratrix, appellant-respondent.

*John A. Murray* of counsel (*Seymour B. Quel* with him on the brief; *Charles H. Tenney, Corporation Counsel,* attorney), for respondent-appellant.

*John M. Keegan* of counsel (*William F. McCauley* with him on the brief; *Keegan & Clarke,* attorneys), for Consolidated Edison Company of New York, Inc., third-party plaintiff-appellant.

*Frank A. Fritz* of counsel (*G. Wallace Bates,* attorney; *Bleakley, Platt, Walker, Hart & Fritz* of counsel), for third-party defendant-respondent.

BOTEIN, P. J. In this action by an administratrix to recover damages for the death of her intestate, defendant Consolidated Edison Company of New York, Inc. (hereinafter "Edison") appeals from a judgment in favor of plaintiff after trial by the court without a jury. The judgment also dismissed plaintiff's complaint against defendant City of New York ("City") and New York Telephone Company ("Telephone"), as well as the various cross complaints asserted by defendants. Finally, the judgment dismissed the third-party complaints of Edison and the City against Empire City Subway Company, Limited ("Empire"). All parties have appealed.

The deceased's employer, Empire, was engaged in constructing new conduits in mid-Manhattan designed to hold additional low-voltage telephone cables for use by defendant Telephone. At the time of the accident decedent was working in a trench excavated by Empire, which was approximately 50 to 60 feet long, 5 feet wide and 7 feet deep. Exposed on the side wall of the trench, some three feet below the street surface and two to four feet above the floor of the trench, was a concrete duct bank owned by Consolidated Telegraph & Electrical Subway Company, which is not a party to this action. This duct bank, which was visible along the entire length of the trench, consisted of 16 concrete ducts encasing cables of defendant Edison that carried 11,000 volts of electricity.

The decedent was electrocuted when a heavy pneumatic jack-hammer drill he was operating pierced the exposed concrete wall of the duct bank and penetrated to the high-tension electric cables inside. The cable which he pierced was a three-conductor cable, and as will be indicated, was well insulated and well protected from outside contacts.

The complaint alleges that defendants were negligent in failing to insulate the cables properly, failing to de-energize or remove

the cables when they learned that excavation was taking place nearby, failing to give warning of the dangerous condition, and failing to take other necessary and proper precautions.

The duties of the respective parties with respect to the installation and maintenance of subsurface utility lines can best be recognized against the background of the underground utility system. As explained in *People ex rel. N. Y. Elec. Lines Co.* v. *Ellison* (188 N. Y. 523) and *Matter of City of New York* v. *Prendergast* (202 App. Div. 308), the telegraph, telephone and electric light companies prior to 1884 carried their wires overhead on poles which lined the streets of Manhattan and The Bronx. Because of the danger represented by these overhead wires, the companies were required to submit plans for placing their wires underground (L. 1884, ch. 534). The Consolidated Telegraph & Electrical Subway Company offered to build the underground conduits or subways. Pursuant to contracts between it and the City, which were ratified by the Legislature (L. 1887, ch. 716), one set of conduits or subways was built to carry low-tension electrical lines for the telephone and telegraph companies, and another set to accommodate the high-tension lines for light, heat and power. In 1891 Empire was authorized to assume the operation and maintenance of the low-tension lines (L. 1891, ch. 231), while Consolidated Telegraph retained control of the high-tension lines. It was contemplated that they would build and maintain the ducts which would be rented to the various utility companies required by law to place their lines and cables therein. (See *Brush Elec. Co.* v. *Consolidated Tel. & Elec. Sub-Way Co.*, 60 Hun 446, 455; *City of New York* v. *Empire City Subway*, 202 App. Div. 494; *Matter of New York Elec. Lines Co.*, 201 N. Y. 321.)

For the excavation that was involved in this case, Telephone had applied to the City for a permit to allow Empire to construct and install new subsurface conduit along East 38th Street in connection with an extension of the telephone building on that street. Empire's engineers obtained plans of the gas mains and water pipes and of Consolidated Telegraph's underground electrical installations along East 38th Street, which they then marked out on their own construction plans. In laying the new telephone cables Empire had to dig a trench which would run parallel to and expose the side of the existing concrete-encased high-tension cable ducts of Consolidated Telegraph. Empire's engineers — who were fellow employees of the decedent — knew that the ducts carried 11,000 volts of electricity (2,300 volts are used for executions at Sing Sing), and that it was extremely dangerous for anyone to drill into the concrete

side of the ducts. When any such drilling or chipping of the concrete was required, Empire could and would call upon Consolidated Telegraph to do the work at its expense.

Empire's engineers and foremen testified that its employees were all informed of the danger. Alesi, a recent immigrant, spoke only Italian, but the assistant foremen and the crew members also spoke Italian and discussed the work in that language. Alesi's jackhammer was equipped with a bull point designed to penetrate rock, but not to chip away concrete from the side wall of the trench. Nevertheless, Alesi, who was only 5 feet 3 inches tall, was standing on the trench floor and drilling into the concrete wall of the trench at a point 3 to 4 feet above the floor, with the jackhammer handle at or above his head. In this position it was extremely difficult to exert pressure on the jackhammer and guide it accurately. With the hammer aimed at the center of the duct banking, the drill point cut through rock, concrete, lead sheathing and insulation and came in contact with Edison's high-tension cable, causing immediate death.

Given these facts, we are of the opinion that there is no basis for imposing liability for negligence on Edison, or indeed on any of the defendants. The theory of plaintiff's case is that Edison knew that the creation of the trench would expose the cable ducts in which its high-tension wires were carried, that it knew that jackhammers or pneumatic drills would be used in making the trench, and that in view of the foreseeable possibility of a workman's tool coming in contact with its cables, it should have taken proper precautions to prevent accidents such as the one which occurred here.

Even if we were to adopt the somewhat unsubstantiated finding of the trial court that Edison was chargeable with actual or constructive knowledge of the fact that excavation work was being done adjacent to the location of its high-tension cables, the fact remains that Edison was a mere tenant using the conduits owned and maintained by Consolidated Telegraph. In this setting, it is difficult to understand how Edison violated any legal duty owed to plaintiff's intestate, or how its acts or omission could be the proximate cause of the unfortunate accident which occurred.

There is no basis whatever for holding that the ducts and cables were not properly constructed and maintained in the first instance. Each of the three conductors comprising the cable was insulated with oil-impregnated paper, all three were covered with an outer belt of proper insulation ⅜ths of an

inch thick, and with a lead sheathing ⅛th of an inch thick, so that they could safely be touched without danger of electric shock, despite the lethal current which coursed through them. As further protection the cables were encased in the concrete walls 3 inches thick.

Not even plaintiff contends that any of defendants were negligent in the physical maintenance of the cables while they were underneath the unbroken street surface. We then inquire whether the opening of the street surface and the consequent exposure of the duct banks imposed a duty upon defendants to erect additional structural safeguards or take further physical precautions to protect those who might come in the vicinity of the cables. In measuring defendant's responsibilities it should be recalled that before an accident could occur after the street opening it would be necessary, as happened here, to break through the protective concrete, pierce the lead sheathing and insulation of the cable and make contact with the conductor.

Hence, it cannot be said that this was an inherently dangerous condition, and that to cope with it extraordinary safety precautions would have to be taken to safeguard those working nearby. The brushing of a worker against the concrete exterior of the duct bank in making excavations, while foreseeable, would not in the ordinary course result in harm. Assuming again, as contended by plaintiff, that all three defendants had adequate notice of the condition, they were not obliged to guard against the possibility that a workman might break through the protective concrete. The work performed by plaintiff's intestate was not intrinsically dangerous, for it was not "necessarily attended with danger, however skillfully and carefully performed" (*Engel* v. *Eureka Club*, 137 N. Y. 100, 104). This is not a case in which bare wires were exposed, presenting danger to all who came near them. Protection was afforded against accidental or fortuitous contact.

Since the cables themselves were adequately safeguarded in the physical sense, was there then an additional duty on the part of any of defendants to take further steps, assuming that they had become aware of construction jobs in the vicinity of the cables? It has been urged by plaintiff that soon as Edison learned that workmen were nearby it should have de-energized or rerouted its cables to render the area completely safe. A duty to take precautions which are completely disproportionate to the dangers presented cannot reasonably be imposed. To de-energize all the cables on East 38th Street simultaneously

would have deprived large areas of the city of electrical power. There would have been no light, no transportation, no refrigeration, no elevator service, and all would be affected—public and private services alike. If this had to be done for each excavation in the city streets adjacent to an Edison electrical installation, the city would virtually become paralyzed, for thousands of such excavations are made every year. There was no duty under such circumstances to de-energize the cables (*Nicholas* v. *New York State Elec. & Gas Corp.*, 283 App. Div. 291, affd. 308 N. Y. 930).

To reroute cables to the other streets on the unlikely contingency that some workman might break through the concrete casing, sheathing and insulation, would be even more impracticable. New duct banks would have to be constructed and new cables laid, and each excavation would produce a proliferating progeny of related excavations in adjoining streets. Overhead wires can be raised, lowered or moved readily, without substantial interruption of service; patently, underground cables cannot be so easily moved or rerouted.

*Pike* v. *Consolidated Edison Co.* (303 N. Y. 1), which is relied on heavily by plaintiff, is not controlling in this case. In the *Pike* case a steelworker was electrocuted when he brought a tall boom cable into contact with uninsulated, high-tension overhead wires. Quite contrary to the circumstances presented here, the merest contact with any of the overhead wires could have been fatal; and both the Appellate Division and Court of Appeals evidently assumed that in safeguarding overhead wires appropriate precautions could be taken which would not be disproportionate to the dangers to be apprehended nor as a practical matter be virtually impossible of performance. In fact, a company engineer had testified that the wires could have been de-energized by other equipment in defendant's possession.

Essentially, the *Pike* case in the Court of Appeals turned on the holding that the defendant prior to the accident had received detailed information concerning the nature and dimensions of a building to be erected in the vicinity of defendant's overhead wires, that it was not unaware of the common use of booms and cranes in the erection of buildings; and '' thus that company had been warned of the probability that workmen erecting the overhead structure there would perchance be exposed to the undisclosed deadly peril which caused the death of the intestate '' (p. 5). In this case anticipation of highly dangerous exposure to the well-protected cables would be a farfetched assumption.

Nor can liability be predicated upon the failure of defendants to give warning of the alleged dangerous condition to plaintiff's intestate. The testimony is clear that the engineers and foremen of Empire were fully aware of the presence of dangerous high-tension cables in the adjoining duct bank. Hence, the imparting of such information to Empire would have given them no more than what they already knew. In view of the hundreds or even thousands of excavations which were in some stage of progress throughout the city at that time, there was no obligation on the part of defendants to station persons on the sites solely to give warning to workmen. "To require the defendant to bring notice home to every employee * * * who might possibly be involved on this job on penalty of otherwise failing in duty would result in imposing a standard of duty exceeding reasonable bounds * * * Any duty on the part of the defendant to warn * * * would ordinarily be discharged when defendant notified all supervisory officials of the decedent." (*Storm* v. *New York Tel. Co.,* 270 N. Y. 103, 109–110.) To require the constant attendance of inspectors at the site of each excavation when the supervisors were already aware of the conditions would be unreasonable. "This would be so onerous as to be practically impossible of execution because of the expense to the company. The law ought not to, and does not, exact an unreasonable amount of care from any one " (*Schmeer* v. *Gas Light Co.,* 147 N.Y. 529, 541). See, also, *Dolan* v. *City of New York* (5 A D 2d 300).

It has not been demonstrated what Edison could have done to bring home to the Empire personnel more knowledge than they already had. Even the posting of signs would have meant little when the duct bank itself was already exposed and the supervisors on the job were fully aware of what it housed. Under the circumstances we can only conclude either that the negligence was solely that of Empire, because of the failure of its supervisory employees to impart knowledge of the dangerous condition to plaintiff's intestate, or if he had in fact been warned, as his coemployees in fact testified, then the accident was attributable solely to his own contributory negligence. In neither event can Edison or the other two defendants be deemed liable. For these reasons the judgment in favor of plaintiff and against the defendant Consolidated Edison Company should be reversed on the law and the facts, with costs to said appellant, and the complaint dismissed. That portion of the judgment in favor of the defendants New York Telephone Company and the City of New York dismissing plaintiff's complaint should be affirmed, with costs to the respondents.

The appeals from that portion of the judgment dismissing the cross complaints and third-party complaints should be dismissed as academic, without costs.

RABIN, M. M. FRANK, VALENTE and BERGAN, JJ., concur.

Judgment in favor of plaintiff and against defendant Consolidated Edison Company unanimously reversed on the law, and on the facts, with costs to said appellant, and the complaint dismissed. That portion of the judgment in favor of the defendants New York Telephone Company and the City of New York dismissing plaintiff's complaint is unanimously affirmed, with costs to the respondents. The appeals from that portion of the judgment dismissing the cross complaints and third-party complaints are dismissed as academic, without costs.

Settle order.