SAMUEL G. NICHOLAS, Respondent, *v.* NEW YORK STATE ELECTRIC & GAS CORPORATION, Appellant, et al., Defendants.

NEW YORK STATE ELECTRIC & GAS CORPORATION, Third-Party Plaintiff-Appellant, *v.* MICHAEL MATHEWS et al., Individually and as Copartners Formerly Doing Business under the Name of MATHEWS & KANELOS Co., Third-Party Defendants-Respondents.

Fourth Department, February 5, 1954.

*Hugh McM. Russ, Robert S. Lesher* and *T. Kayler Jenkins* for appellant.

*Michael Catalano* for respondent.

*Robert D. Fernbach* and *Bernard Katzen* for third-party defendants-respondents.

VAUGHAN, J. This is an appeal by the defendant and third-party plaintiff New York State Electric & Gas Corporation from a judgment in favor of the plaintiff Samuel G. Nicholas for $40,573.17, entered upon a jury verdict for $40,000 and in favor of the third-party defendant Mathews and Kanelos dismissing the third-party complaint, with costs. The action as originally commenced was against the New York State Electric & Gas Corporation, hereinafter referred to as " electric company " as the sole party defendant. Thereafter plaintiff by leave of the court served a supplemental summons and amended complaint joining the Niagara Mohawk Power Corporation, hereinafter referred to as " power company " as an additional party defendant.

The answer interposed by the power company contained a cross claim against the electric company. The electric company in turn commenced a third-party action by service of a supplemental summons and a third-party complaint upon the defendant Mathews and Kanelos. The actions were moved for trial at a trial term of the Supreme Court, Erie County. At the close of the plaintiff's case the court, upon motion of the power company, granted a nonsuit and dismissal of the complaint as to that defendant. While the notice of appeal is from each and every part of the judgment as well as from the whole thereof, it specifically refers to the judgment obtained by the plaintiff and the action of the trial court in dismissing the third-party complaint. In any event, no point is made upon the appeal criticizing the action of the court in dismissing the complaint as against the power company.

The facts pertinent to the discussion of this appeal are these: The electric company distributes electric current for industrial

and household uses to its customers in numerous towns in Erie County, south of Buffalo, New York. It purchases its current for distribution from the defendant power company which at that time, September 22, 1950, owned and operated a substation at Gardenville, New York, for the distribution of high voltage electricity. Prior to that date the power company had leased a portion of its land within the substation enclosure immediately adjacent to its substation to the electric company. Upon the land so leased the electric company erected a station of its own which included transformers for the reduction of the power purchased from the power company from 115,000 volts to 34,500 volts and various conductors, switches and other equipment for the distribution of power at the reduced voltage to its customers over the various transmission lines emanating from its substation.

The photographs in evidence show the general design of the substation. It consists of a series of upright H beams and attached cross I beams running in an east and west direction. The whole steel structure is grounded so that any current reaching the structure would immediately pass to the ground and be dissipated through the earth. Attached to the cross I beams were bus bars mounted on insulators. The bus bars consisted of hollow copper tubing running north and south which served as conductors of electricity. The bus bars loom large in the matter under review. The other equipment going to make up the substation has already been referred to.

The photographs taken from a point south of the substation looking in a northerly direction bring out in bold relief the south end of the substation where the accident occurred. The two vertical steel uprights shown are twenty-two feet apart supporting the two horizontal six-inch steel I beams. On the lower cross beam is mounted the so-called " main bus " consisting of three copper tubes which were de-energized or " cold " at the time of the accident. The tubes in the main bus are atop the three insulators. On the upper cross beam and to the east of the main bus was suspended the so-called " transfer bus." This also consisted of three copper tubes which were energized or " hot " at the time of the accident. The lower of the two cross beams is eighteen feet from the ground and the upper beam is twenty-six feet from the ground. The insulators on which the upper bus bars are suspended are eighteen inches to twenty-one inches long. Thus, the transfer bus is approximately five feet nine inches above the lower cross beam.    . . .

It appears from the testimony of plaintiff's electrical engineering expert that the electric company's substation was constructed in accordance with accepted engineering principles, was of standard design and the equipment used therein was standard in the industry for that type of electrical installation. Certain parts of the two electrical transmission systems were able to be integrated by means of a tap maintained by the power company in its system known as the "Shaleton" tap. By use of this tap it was physically possible to furnish electricity to the customers of the electric company located in Hamburg, Orchard Park and Boston, provided the power company could stand the extra load at the time requested by the electric company.

Having briefly outlined the physical layout of the place of the accident, we turn to the facts leading up to the accident. The plaintiff's employers Mathews and Kanelos, the third-party defendants, were partners in the painting business, doing business under the firm name of Mathews & Kanelos Company. They specialized in the painting of structural steel and had done painting of substations. By letter dated March 9, 1950, they solicited the business of the defendant electric company, representing that they had twenty-eight years of experience in structural steel painting. On the following July 11th, the electric company engaged them to wire brush and paint its steel structural substation at Gardenville, New York, where the accident in question occurred.

The record indicates that the plaintiff was an experienced structural steel painter. During the course of his work, he had painted near live electric wires. In his experience it was nothing new to him to be called upon to do painting in close proximity to electric wires or tubes.

Prior to submission of the bid on the painting job, the electric company's assistant superintendent, Mr. Harold C. Coleman (not to be confused with plaintiff's electrical engineer, Mr. J. Burgess Coleman) pointed out to the third-party defendants at the substation the requirements of the job, explaining to them that it was not possible to shut down the entire substation during the painting because it was necessary to furnish electricity to certain of the communities. On that same occasion, it was explained that the bus bars in a portion of the structure would be de-energized so that that portion could be painted. Then as the work progressed, other sections would be de-energized and those in turn would be painted.

That the third-party defendant, Michael Mathews, his son Gust and the plaintiff fully understood the procedure to be fol-

lowed appears from the bill of particulars furnished by plaintiff. They were cautioned not to get closer than from three to five feet of any hot conductor. These "Instructions were given to Mr. Mike Mathews, Mr. Gust Mathews and Mr. Samuel G. Nicholas." They appreciated that the job was a hazardous one. Before they started work on the morning in question, Mr. Harold C. Coleman, assistant superintendent, took all three painters, the plaintiff and the two Mathews, father and son, to the part of the structure which was to be painted first, pointing out the portion of the structure that had been de-energized. He showed them the three main bus bars which were de-energized or cold and the three transfer bus bars which were hot. Plaintiff admits that Mathews warned him about the hazards of the particular job and warned him to be careful.

Under normal operations, the main bus was used in connection with the servicing of the customers of the electric company. The de-energizing of the main bus necessitated the energizing and use of the transfer bus to service the towns of Hamburg, Orchard Park and Boston since the Shaleton tap of the power company was not available that morning. The switching necessary to accomplish these results was done by the employees of the power company. As an added safety precaution, special wires to ground were attached to certain of the conductors near the airbrake switches, to take care of any static electricity. Grounds were also attached directly to each of the main bus bars. These would have the effect of causing an immediate ground fault if any one of the bus bars in the main bus had become charged with current. With all of those cautionary instructions fresh in their minds, the plaintiff and his two associates started to work. The work proceeded without incident throughout the morning. During that period plaintiff painted the top of the cross beam to which the hot transfer bus bars were suspended. In doing the work, plaintiff straddled the beam facing the hot bus, starting a safe distance to the west of the hot bus and worked backward over to the westerly end of the cross beam. Gust Mathews painted the upright columns and his father Mike painted the lower cross beam from a ladder extending from the ground to the beam to the extent shown in the photographs taken the day of the accident. After lunch the three painters returned to work. Gust was on the ladder placed against the lower cross beam doing some touching up. The plaintiff was on the ladder to the north of the cross beam leaning against the cross beam which runs in a northerly and southerly direction. This ladder is shown in the photographs last referred to. It

does not appear where Mike Mathews was painting but it does appear that all three returned to the ground when Mr. Harold C. Coleman called them to come down. Coleman told them that the easterly transfer bus was to be de-energized and instructed them to remain on the ground until the necessary switching had been completed to accomplish that purpose. The switching referred to would make possible the use of the Shaleton tap to supply power to Hamburg, Orchard Park and Boston, thereby eliminating the use of the transfer bus and making possible painting in the remaining easterly portion of the south bay. The switching planned was never started, the accident having occurred prior to the issuance of any order to carry into effect the switching necessary to de-energize the transfer bus.

Following instructions to the three painters to remain on the ground until the switching had been completed, Coleman left the men to go back to the substation office to arrange for the necessary switching operation. In the meantime Gust Mathews prepared to move the ladder placed against the lower beam to the west in order to remove coverings from some of the insulators shown at the extreme left of the photographs taken immediately following the accident. Before moving the ladder, he noticed his paint bucket hanging on the third rung below the cross beam. This bucket is clearly shown in those same photographs. It was called to plaintiff's attention who thereupon volunteered to bring the bucket down. The plaintiff thereupon started up the ladder. Gust Mathews remained at the foot of the ladder with one hand upon the ladder. He paid no attention to plaintiff as he ascended the ladder. Suddenly a flash occurred accompanied by an explosion. Plaintiff fell to the ground landing some three to five feet east of the base of the ladder. The question immediately arises, where was the plaintiff at the time of the flash and explosion?

There are no eye witnesses who can testify where the plaintiff was when the flash and explosion occurred other than the plaintiff himself. He claims, however, to be unable to recall where he was when the flash occurred. It is his story that the last he remembers he was starting up the ladder. How far up he got he does not remember nor is he able to say whether he was on the ladder. He cannot say, however, that he was not on the lower cross beam. Certain we are that he did not go up the ladder to do any painting. His only reason for going up the ladder was to get the paint bucket left by Gust Mathews. Gust, who had his hand on the ladder, received no electrical shock. The fact is, however, that plaintiff did receive an electrical shock

of such severity as to cause severe electrical burns, to set his clothing afire and to throw him to the ground.

It is urged that it is improbable that he went up the ladder beyond the paint bucket. The short answer to such contention is that it was impossible for plaintiff to have received an electrical shock if he did not ascend the ladder beyond the paint bucket. The only possible explanation of plaintiff's unfortunate accident is that he was upon the lower cross beam and that some part of his body was within two feet of one of the hot bars of the temporary bus. The testimony of plaintiff's electrical expert points unerringly to that conclusion. He testified that two feet would be a safe distance from the hot transfer bus; that electricity might jump anywhere from six inches to two feet.

However, it is only after the circuit is first established that '' an arc '' can be drawn out for several feet. He testified further after contact was established and an arc drawn out, there would be a '' rather large explosion, the brilliant flame, a lot of fire '' and the person within the circuit would lose his grip because of the paralyzing effect on the nerves. He also testified, if lightning was not the cause of the arc, a foreign body coming within the field is the only thing that would cause the arc. We are told that if a person was standing on the lower cross or I beam and it became energized the person would not be harmed as long as he was not within two feet of some other live conductor. There being no claim that lightning was the cause of the arc, it follows that the arc can, under the evidence in this record, only be accounted for by a foreign body coming into the field. The circumstances all point to the conclusion that plaintiff's body was the foreign body that came into the field causing the arc. The circumstances are these: (1) the footprint shown in the photographs of a left shoe on the lower I beam just to the left of the ladder which plaintiff ascended to get the paint bucket. No one had been on the beam in that area that morning, all the painting having been done from a ladder. The mark was not there when Gust Mathews painted the beam nor was it there when Gust came down off the ladder that afternoon at the call of Harold C. Coleman. This was immediately before plaintiff ascended the ladder to get the paint bucket. Gust Mathews saw the mark on the beam following the accident. Both William Forster and Robert A. Nicholson, employees of the electric company, also saw the footprint following the accident. In addition, Charles Seebald, an employee of the power company, observed the footprint following the accident. There was also testimony that the paint was

pitted on the beam in the blackened area surrounding the shoe mark shown in the photographs; (2) the testimony of Nicholson and Goyette placed the body of plaintiff immediately following the explosion in the air at about the level of the I beam or cross beam which point was above the point where the bucket hung on the ladder; (3) William Forster, superintendent of dispatching and maintenance of the electric company, testified that he discovered a bright pit mark on the center bus bar of the transfer bus following the accident which was the phase of the transfer bus approximately over the mark on the top of the I beam; and that the pit mark on the bus and the pit mark on the I beam were of the type caused by electric current passing into and out of those types of metal; (4) in addition, we find plaintiff's medical expert, Dr. Lawrence J. A. Miano, testifying that plaintiff's injuries consisted of severe third degree burns about the mid-portion of the forearm and at the instep of the foot '' evidently where he had made electrical contact to give him —— ''. The doctor also testified: '' Those areas were identified as the contact points of the electrical current, that is, the burns of the left instep and the left forearm.''

More convincing evidence would be difficult to find to establish the cause of plaintiff's misfortune. It all points to carelessness on the part of the plaintiff in unnecessarily going upon the beam and coming in such close contact with the '' hot '' transfer bus as to cause electric current to arc and pass through his body producing the injuries complained of.

Concededly, the defendant was required to exercise reasonable care to see to it that plaintiff was not injured while upon its premises. In considering its duty to exercise such care, we should not overlook that it was a public service corporation which was under a continuing duty to supply current to its customers. It was impossible to shut down its entire substation and at the same time serve its customers unless some substitute transmission line was available as a means for distribution of current. In this instance, the only substitute transmission line available for service of defendant's customers, in addition to the transfer bus, was by means of the power company's Shaleton tap. This line was available to the electric company only upon consent of the power company and whether such consent could be secured depended upon the load already being carried over the Shaleton tap and other factors not within the control of the electric company. As already pointed out, when the painters arrived upon the job on the morning in question, they were

warned as to what portion of the substation was hot, that is, energized with electricity and what portions were cold, that is, de-energized and they were warned against approaching within three to five feet of any hot installation.

Considering the evidence as a whole, it is difficult to understand in what respect the defendant failed to exercise reasonable care toward the plaintiff. The situation was fully explained to him, the dangers were pointed out and he was specifically warned to stay away from the danger areas created by the hot bus bars. Just prior to the accident, he had been called down from the substation structure and told to remain on the ground until further orders which would follow the completion of the switching necessary to de-energize the hot transfer bus bars. Some claim is made that he was told he could go up the ladder to get the paint bucket. If true, such permission did not, in our opinion, constitute a revocation of the prior order to remain on the ground. Permission to go part way up the ladder to get the paint bucket would not endanger him. The ladder was not grounded. The permission given did not contemplate plaintiff going within the danger zone surrounding the hot transfer bus. Others had been standing on the ladder painting all morning and during the early afternoon without injury. Gus' Mathews was in contact with the ladder at the time plaintiff sustained his injury but received no shock. Three other persons, Seebald, Nicholson and Forster went up the ladder after the circuit was re-established without injury — without shock. The ladder not being grounded, it was not a conductor of electricity. There had been no switching or change in the electrical circuits in the substation from early morning and prior to the time the painters started working. While defendant was required to exercise reasonable care to prevent foreseeable injury to plaintiff, it was not an insurer of his safety to the extent that it was bound to eliminate all possible risks. It certainly was not bound to foresee and guard against personal injury to plaintiff after he had been warned to come off the substation structure and remain on the ground until the proposed switching had been completed. Even though, as plaintiff claims, he had permission from Coleman to ascend the ladder to get the paint bucket, such permission if given did not call upon the defendant to foresee or anticipate that plaintiff would go beyond the paint bucket and in some manner come into close contact with the hot transfer bus bars which he knew were there and knew were dangerous. Negligence is always measured by the duty to anticipate or foresee (*Flaherty* v. *State of New York,* 296 N. Y. 342; *Poplar*

v. *Bourjois, Inc.,* 272 App. Div. 74, affd. 298 N. Y. 62; *Lane* v. *City of Buffalo,* 232 App. Div. 334, 338; *Abbott* v. *New York Public Lib.,* 263 App. Div. 314, 318). The plaintiff contends, however, that there was something defective about the transformer — a direct short in it, thereby causing the 34,500 volt transfer bus to be charged with 115,000 volts of electricity. This would be " a very remote possibility ", according to plaintiff's electrical expert. The answer to such contention is that at the time plaintiff brought his body into such close proximity to the hot transfer bus bar, thereby creating a direct circuit to ground, the oil circuit breakers tripped, cutting off all current into the transformers and into the transfer bus bars. That there was no trouble in the transformer clearly appears from what followed. The circuit breakers were reset and throughout the remainder of that day and the following day the transformers worked properly. Had there been any difficulty after the circuit breaker was reset it would trip out again. In addition, we have the positive and uncontradicted testimony of the witnesses Forster, H. C. Coleman and Nicholson that there was no trouble with the transformers throughout the day.

It is further urged by plaintiff that the transformers must have been defective because new transformers were being installed. The fact is a new transformer had been installed and tested prior to the accident and the old one was being loaded on to a truck for removal that day. It is significant that the defendant was not replacing transformers by others of the same type but rather substituting new transformers of a " newer model and larger size." Such change does not raise any inference that the transformers being substituted were defective as plaintiff would have one believe.

We feel that the state of the record is such that further discussion of the question of defendant's negligence is not required.

Little need be said on the question of plaintiff's contributory negligence. The burden was upon the plaintiff throughout the trial to establish his freedom from contributory negligence. This he failed to do. He may not escape that burden by saying he could not recall where he was at the time of his injury. (See *Hayden* v. *Joline,* 137 App. Div. 755; *Walheim* v. *City of Batavia,* 257 App. Div. 904.)

In our opinion, the plaintiff has failed to establish any actionable negligence on the part of the defendant or his own freedom from contributory negligence. It follows that the judgment should be reversed and the complaint dismissed.

WHEELER, J. (dissenting). Plaintiff-respondent, an employee of a painting contractor, has been awarded a verdict of $40,000 for injuries sustained while engaged in painting the steel framework of defendant-appellant's electrical substation. This substation was maintained by appellant for the receiving and distribution to its customers of high voltage electric power. It consisted of an open steel structure containing transformers for the reduction of power from 115,000 volts to 34,500 volts, and various conductors, switches, high tension wires and other equipment for the distribution of power at the reduced voltage over its various transmission lines.

The accident occurred at the south end of the structure, which consisted of two vertical steel uprights twenty-two feet apart, supporting two horizontal six-inch I beams. On the lower beam was mounted the so-called "main bus" consisting of three copper pipes, which were de-energized or "cold" at the time of the accident. Suspended from the upper beam was the so-called "transfer bus" which was energized, or "hot". The lower beam was eighteen feet above the ground and the upper beam twenty-six feet above the ground. The hot transfer bus was approximately five feet nine inches above the top of the lower beam. It is conceded that a person in contact with a steel beam, and any part of whose anatomy should come within two feet of the hot bus bars carrying this lethal current of 34,500 volts would sustain an electric shock of paralyzing effect.

The plaintiff and two other painters started work in the morning of the day of the accident. They had painted portions of the two I beams which were "safe". Shortly after lunch, the men were directed to remain on the ground and not to do more painting, as certain switching of the electric current was about to take place, which would take forty-five minutes to an hour to do. However, that order was, in effect, countermanded in part. At that particular time, there was a ladder leaning against the lower I beam and located almost directly under the hot transfer bus. A bucket of paint hung on the ladder about three feet underneath the lower beam. There was evidence that the painters, including plaintiff, had received permission from appellant's assistant superintendent to remove the paint bucket preparatory to using the ladder in removing drop cloths from the insulators before the switch-over of the current.

The plaintiff started to climb the ladder, and within seconds there was a "thunderous noise" accompanied by a "white flash", and plaintiff was observed falling from a position near

the lower I beam. Inasmuch as there were no eyewitnesses and plaintiff has no memory of what occurred after starting up the ladder, and did not regain consciousness until he was lying on the ground with his clothing in flames, he must necessarily rely upon circumstantial evidence to sustain his cause of action.

I feel that the circumstances as proved clearly point to the fact that plaintiff ascended the ladder to a height which permitted him to reach the danger zone some three feet nine inches above the lower beam, and thus to come into contact with the high voltage current.

I do not regard the case as having been submitted under the *res ipsa loquitur* doctrine. The jury was correctly instructed that appellant owed to respondent, an invitee upon its premises, the duty of using reasonable care to safeguard the respondent while working upon this extremely dangerous structure. Implicit in the jury's verdict is the finding that respondent failed in its duty to use care commensurate with the risk of danger reasonably to be foreseen.

As I view the evidence, the jury was justified in determining that the oral warnings given to the plaintiff when he first arrived on the premises that morning, pointing out the particular portions of the structure which were energized, and the so-called rope guards, were wholly inadequate in view of the fact that plaintiff was to work in close proximity to the high tension wires. "When peril lurks, its creator is bound to provide safeguards. Unusual precautions must be taken against extraordinary dangers." (*Van Leet* v. *Kilmer*, 252 N. Y. 454, 457.) The jury might have found that appellant's assistant superintendent, the person whose duty it was to supervise the painters, left the sub-station, knowing that it was necessary for one of the painters to climb this ladder. There was, in fact, no supervision whatsoever of plaintiff at the time of the accident.

Neither were any guards, ropes or other warning placed around the transfer bus. The only ropes or flags were attached about two feet below the lower I beam, and consequently would appear to be utterly useless as a protective guard for the transfer bus.

Moreover, the record discloses that appellant by obtaining the use of Shaleton tap, could have rendered the area in question entirely free from danger, although this would undoubtedly have increased the cost of the painting. The appellant having chosen to proceed with the work without this obtainable safeguard, was under a duty to exercise such care as would be

commensurate with the inherent danger hidden in its high voltage equipment. (*Pike* v. *Consolidated Edison Co.,* 303 N. Y. 1.)

Likewise I think that plaintiff's freedom from contributory negligence presented a question of fact for the jury to determine. It is a fair inference that while inspecting the paint or touching up a bare spot before removing the ladder, plaintiff may have relaxed his vigilance for a brief instant, or miscalculated the distance, thereby coming into contact with this hidden peril. (*Nicholson* v. *Greeley Square Hotel Co.,* 227 N. Y. 345.) In any event, the question of contributory negligence was for the jury.

In my opinion, the finding of the jury as to defendant's negligence and plaintiff's freedom from contributory negligence was adequately supported by the evidence. I dissent and vote to affirm.

All concur, except McCurn, P. J., and Wheeler, J., who dissent and vote for affirmance in a separate opinion by Wheeler, J.

Present — McCurn, P. J., Vaughan, Kimball, Piper and Wheeler, JJ.

Judgment reversed on the law and facts, with costs, and complaint dismissed, with costs. [See *post,* p. 915; 284 App. Div. 835, 860.]