■ LINDA MINER, Individually and as Administratrix of the Estate of EDWARD MINER, Deceased, Respondent-Appellant, v LONG ISLAND LIGHTING COMPANY, Defendant and Third-Party Plaintiff-Appellant-Respondent; FLORAL PARK LANDSCAPING CO., INC., Third-Party Defendant-Appellant-Respondent.—In a negligence action to recover damages for personal injuries and loss of consortium, (1) defendant and third-party plaintiff the Long Island Lighting Company (Lilco) and third-party defendant Floral Park Landscaping Co., Inc., appeal from a judgment of the Supreme Court, Kings County, entered April 9, 1973, in favor of plaintiffs against Lilco upon a jury verdict; (2) Floral Park also appeals from an order of the same court, entered

January 4, 1973, which, *inter alia,* granted Lilco's motion to set aside the jury verdict in the third-party action on the ground of inadequacy (that verdict awarded Lilco recovery over against Floral Park of 5% of the amounts of the verdict in favor of plaintiffs against Lilco) unless Floral Park were to stipulate that its degree of fault be fixed at 25% of plaintiffs' verdict against Lilco; and (3) plaintiffs appeal from an order of the same court, dated September 9, 1974, which, upon Floral Park's motion, set aside the verdict and the judgments thereon to the extent of directing a new trial between plaintiffs and Lilco on the issue of damages. Judgment reversed, on the law and the facts, without costs, and complaint and third-party complaint dismissed. Orders reversed, on the law, without costs, and motions dismissed as academic. Plaintiff Edward Miner, while acting in the course of his employment as a tree trimmer for third-party defendant Floral Park on August 15, 1969, was subjected to a strong current of electricity when he came into contact with a high tension wire which ran through a tree. The wire was owned and maintained by defendant Lilco, which had installed it in 1941. Its installation concededly exceeded the minimum safety requirements of the National Electric Safety Code and was in conformity with the practice throughout Long Island and, indeed, throughout the United States. Expert witnesses called by plaintiffs testified that the wire, which had a weatherproof covering, would have been safer had it had a polyethylene insulation. One of these witnesses said that even with such insulation the wire should be treated as though it were "hot" and that he would not approach such a line "with a ten-foot pole". Miner, who testified that he had little previous training or experience with regard to electrical lines, had received oral instructions from his employer two days before the accident to trim the tree through which the line ran. He was aware of the presence of the wire. In our opinion the proof did not establish Lilco's negligence. Although the rules of the Board of Standards and Appeals (12 NYCRR 3.1 *et seq.),* promulgated by virtue of the provisions of section 206 of the Labor Law (L. 1967, ch. 623, § 1), required that Lilco be notified that a tree trimmer was to do work in the vicinity of the line, no such notice was given and Lilco was unaware that such work would be in progress. There was no latent defect or unknown danger in the wire. In the cases in which electric companies have been held liable as the result of contact with a high tension wire the companies had knowledge that work was being done in the area of the wire and, having knowledge, failed to properly warn, deenergize or reposition the wire (see, e.g., *Collins v City of New York,* 28 NY2d 910; *Troidle v Adirondack Power & Light Corp.,* 252 NY 483; *Mikolasko v New York State Elec. & Gas Corp.,* 8 AD2d 648, mot for lv to app den 7 NY2d 707; *Ostrom v Patchogue Elec. Light Co.,* 32 AD2d 671; *Nicholas v New York State Elec. & Gas Corp.,* 283 App Div 291, 299). Lilco was not bound to use the best methods or to have the safest line (cf. *Garthe v Ruppert,* 264 NY 290, 296), but was merely bound to keep the line in a reasonably safe and appropriate condition. This it did. The cases relied upon by plaintiffs, such as *Smullen v City of New York* (28 NY2d 66) and *Runkel v City of New York* (282 App Div 173), are not apposite, as they involved either latent defects or a danger unknown to the user of the instrumentality. This case, however, involved a wire with no latent defect and its danger as a live wire was known to Miner. Plaintiffs also argue that the line was placed too close to a house and that its proximity could have resulted in injury to someone working on the roof of the house. They rely upon a series of cases that stand for the general proposition that negligence can be found even if the defendant cannot foresee the particular manner in which an accident will

occur, as long as the possibility of an accident occurring is clear. Here, however, the wire actually conformed to prescribed safety requirements and its proximity to the house had nothing at all to do with the accident. Were the wire in fact placed too close to the house, persons unaware of the danger might have been exposed to the wire. If such a person had been injured, negligence would have arisen out of the placement of the wire. Such negligence, however (if, indeed, there was such negligence in this case—the clearance from the house to the wire appears to have been about nine feet), did not contribute to Miner's accident. He was a tree trimmer. Lilco had the right to expect conformity with the rules governing tree trimmers promulgated by the Board of Standards and Appeals. His injury was unrelated to the distance of the wire from the house. The electric line presented to him a known danger. Similarly, the suggestion in plaintiffs' brief that the waterproof covering on the line resembled polyethylene insulation in appearance and thereby gave a false impression of safety is not persuasive. Miner testified that he tried to keep away from the wire. He did not rely upon its appearance as an indication of its safety. Hence, any negligence in the appearance of the wire was not a proximate cause of the accident. Gulotta, P. J., Christ and Munder, JJ., concur; Hopkins, J., dissents and votes (1) to reverse the order which set aside the verdict against Lilco in the main action and deny the motion upon which that order was made; (2) to affirm the order which set aside the verdict in the third-party action unless Floral Park were to stipulate that its degree of fault be fixed at 25% of plaintiffs' verdict; (3) to affirm the judgment insofar as it is in favor of plaintiff Linda Miner on her cause of action for loss of services, etc.; and (4) to reverse the judgment insofar as it is in favor of Edward Miner (now deceased) and to grant a new trial on his cause of action, on damages alone, unless the plaintiff administratrix stipulates to reduce the verdict of that cause to $850,000, with the following memorandum: Plaintiff Edward Miner was given a jury verdict against Lilco in the sum of $2,000,000 on December 15, 1972. The jury at the time of the verdict decided that Floral Park, the employer of Miner, should bear 5% of the liability. Thereafter, Lilco moved to set aside that apportionment, and the trial court granted the motion unless Floral Park were to stipulate that its liability should be 25%. Edward Miner died on November 7, 1973. On September 9, 1974 the trial court set aside the judgment on the main action and directed a new trial because the judgment was considered excessive in view of Miner's death. From these facts three principal issues evolve: (1) whether the jury could properly find Lilco liable for Miner's injuries by reason of its negligence; (2) whether the trial court should have set aside the judgment because Miner died while the case was in the appellate process; and (3) whether the judgment was excessive. 1. *The liability of Lilco.* The electric line which caused Miner's injuries carried over 7,000 volts. It was maintained on private property under an easement executed in 1940, which, among other things, permitted Lilco to trim any trees in its vicinity so as to clear its lines by at least 48 inches on either side. The line was stretched through the branches of a large tree which stood within seven feet of a building on one side and within 12 feet of another building on the other side. Though covered with material, the line was not insulated. Miner was employed by a tree trimming company which had been hired to trim the branches of the tree. The photographs in evidence show that the tree was located between two houses in what appears to be a residential development. While engaged in his work, Miner came into contact with the high voltage wire and received serious injuries. The duty of Lilco, as a supplier of electricity, has been defined by

case law. In 1911 the Court of Appeals held that a power utility must apprehend that under certain circumstances a person may come into contact with high voltage wires and must guard against such a contingency *(Braun v Buffalo Gen. Elec. Co.,* 200 NY 484, 490). The question in each case is the character of the circumstances which require the exercise of those precautions. *Braun* emphasized the nature of the environment in which the wires are strung—in that case, as here, the setting was a well developed area. In *Olm v New York & Queens Elec. Light & Power Co.* (188 App Div 19) the court recognized that insulation of high tension wires must be provided where it could be foreseen that persons might lawfully climb trees through which such wires were placed. Here the easement which Lilco obtained is proof that Lilco foresaw that the trimming of branches would be necessary, and there is no doubt that Miner was lawfully engaged in pursuit of that task at the time of the injury. Indeed, the presence of a high voltage line in a place where persons might reasonably be foreseen to frequent has been said in itself to impose a duty of a high degree of care on the utility *(Burrows v Livingston-Niagara Power Co.,* 217 App Div 206, 208, affd 244 NY 548). The test of liability, in short, is reasonable care—"a relative term varying with circumstances and surroundings" *(Ferrari v New York Cent. R. R. Co.,* 224 App Div 182, 186, affd 250 NY 527; see, also, *Caruso v Troy Gas Co.,* 153 App Div 431, affd 209 NY 510; *Dutcher v Rockland Elec. Co.,* 123 App Div 765, affd 195 NY 540). Hence, it is properly a jury question, just as the issue of contributory negligence of Miner was for the jury *(Krastel v Long Is. Light. Co.,* 272 App Div 833; *Braun v Buffalo Gen. Elec. Co.,* 200 NY 484, 495–496, *supra),* * whether Lilco discharged its duty of reasonable care. In this case, beyond the nature of the setting in which the injury occurred, plaintiffs produced expert testimony, properly admissible (cf. *Troidle v Adirondack Power & Light Corp.,* 225 App Div 444, 448, revd on other grounds 252 NY 483), that Lilco should have insulated the wires. Unless, therefore, Lilco established facts presenting a defense excusing its failure to insulate the wire, the jury verdict in favor of plaintiffs was warranted. Lilco points to two factors which it claims removes liability. First, it urges that it would be put to enormous expense to insulate high voltage wires in suburban territory. It is questionable whether its claim applies to this case, where special circumstances exist in the form of the tree branches intersecting the line itself and its close proximity to a house. But, even so, the claim was answered by the Court of Appeals in *Braun* about 30 years before the line was installed. "While the convenience of electric and telephone wires is obvious and their maintenance should not be burdened with excessive liabilities, still it seems clear that a company maintaining dangerous wires should not be relieved on the ground of expense from the affirmative duty of exercising a reasonable degree of care to maintain proper insulation and thereby prevent accidents reasonably to be apprehended to those lawfully coming in the neighborhood of such wires" *(Braun v Buffalo Gen. Elec. Co.,* 200 NY 484, 490, *supra).* The second factor which Lilco contends protects it from liability is its compliance with the National Electric Safety Code and with the practices of other utilities. Such compliance is, however, not conclusive. It is but some evidence of the

---

* Cases in other jurisdictions hold likewise. See Philbin v Marlborough Elec. Co. (218 Mass 394); Yeager v Edison Elec. Co. (242 Pa 101); Holden v Cincinnatti Gas & Elec. Co. (57 Ohio App 448); Polk v City of Los Angeles (26 Cal 2d 519); San Diego Gas & Elec. Co. v Davey Tree Surgery Co. (11 Cal App 3rd 1096); Blackwell v Alabama Power Co. (275 Ala 123).

exercise of due care *(Sherman v Lowenstein & Sons,* 28 AD2d 922; 2 Harper & James, Law of Torts, § 17.6, p 1014). In the words of Judge Learned Hand, a trade or industry "never may set its own tests, however persuasive be its usages. Courts must in the end say what is required; there are precautions so imperative that even their universal disregard will not excuse their omission" *(The T. J. Hooper,* 60 F2d 737, 740; see, also, *Galloway v Singing Riv. Elec. Power Assn.,* 247 Miss 308; *Northern Virginia Power Co. v Bailey,* 194 Va 464; *Henderson v Kansas Power & Light Co.,* 184 Kan 691). The jury was free to weigh the other circumstances with the evidence of compliance and to reach a conclusion of Lilco's liability despite that evidence. Lilco's dependence on the fact that it had not been notified of the work to be performed by Miner, which notification is required by the rules of the Board of Standards and Appeals, does not suffice to relieve it from liability to Miner. Indeed, Miner's employer may have had a duty to notify Lilco, and its failure to do so was clearly a matter which bore on the apportionment of liability between Lilco and itself; yet, so far as Miner was concerned, Lilco's duty to him was measured, as we have seen, by the common-law standard of due care under all the circumstances. I thus come to the conclusion that the jury could reasonably find Lilco liable to Miner. 2. *The effect of Miner's death on the verdict.* The injuries to Miner were serious; the verdict was $2,000,000. He died less than a year after the return of the verdict. His counsel, using a blackboard, argued to the jury that the injuries were permanent and so severe that he was rendered helpless, needing nursing and medical care for the remainder of his life, which according to the expectancy tables was predicted to be 43.8 years. The trial court set aside the judgment and ordered a new trial on the theory that the verdict was based on Miner's needs over a period of years, and his death within such a short time after the verdict ended those needs, thereby making such a high award of damages unfair enrichment. At common law an injured party is restricted to a single recovery, embracing all elements of his damages, whether past, present or future (1 Am Jur 2d, Actions, § 144). Hence, a judgment in an action for personal injury precludes a second action for damages later discovered. In a wrongful death action, the rule is that conditions are determined as of the time the cause of action arose, so that the remarriage of the surviving spouse, for example, does not prevent full recovery *(Rodak v Fury,* 31 AD2d 816; *Luddy v State of New York,* 30 AD2d 993, affd 25 NY2d 773; *Lees v New York Cons. R. R. Co.,* 109 Misc 608, affd 193 App Div 882; cf. Ann 30 ALR 121). The power of the court to order a new trial under the circumstances of Miner's death during the appellate process comes down to a consideration of policy. Usually, a new trial because of facts discovered after trial relevant to the recovery of damages is directed only where fraud or deceit was practiced at the trial *(Papathanasi v Reiter,* 270 App Div 308, 310; *Swarzina v Knight & Timoney, Inc.,* 265 App Div 33, 35–36; *Jensen v Hamburg-American Packet Co.,* 23 App Div 163, 168–169; cf. *Fogel v Interborough Rapid Tr. Co.,* 185 NY 562; Ann 55 ALR3d 696). That is, of course, not the posture here. Miner's unfortunate physical condition was fully disclosed at the trial. The medical testimony indicated that his life expectancy was a highly uncertain component to be evaluated by the jury. Indeed, life expectancy tables are in themselves averages which treat both longevity and short duration of life to reach an approximation for the purpose of litigation. Usually, a new trial is not ordered when it is discovered after trial, for instance, that medical opinions adduced in testimony were not borne out by subsequently occurring facts (see, generally, 58 Am Jur 2d, New Trial, § 182; Ann 31 ALR2d 1236). In *Dempsey v Thompson*

(363 Mo 339) the plaintiff who had recovered damages for future loss died a little more than a year after the trial from causes unrelated to the injuries suffered as the result of the defendant's negligence. The court denied the defendant's application for a new trial, noting that statistics relating to life expectancy were only averages for the consideration of the jury (see, also, *Campbell v American Foreign S. S. Corp.,* 116 F2d 926, cert den 313 US 573). Indeed, the rule has been sometimes enunciated that recovery for impaired earning capacity in the future is not based on shortened life expectancy, but on the usual expectancy (22 Am Jur 2d, Damages, § 92, p 135; but see *id.,* § 107). More to the point, as argued by Lilco, is that the recovery awarded by the jury was excessive. I would therefore reverse the order granting a new trial and address myself to that issue. 3. *The size of the verdict.* The rule which traditionally obtains to determine the excessiveness or inadequacy of a verdict awarding damages is whether the verdict shocks the conscience of the court *(Mathews v Brooklyn & Queens Tr. Corp.,* 245 App Div 731; *Irwin v Klein,* 243 App Div 23; cf *Richards v Sandford,* 2 E. D. Smith 349, 351). The amount of damages is peculiarly a matter for the trier of the facts, and the rule perhaps was calculated to restrain the power of the court to modify the verdict in the exercise of a discretion unfettered by standards. Yet, where a verdict awarded by the jury is so large, as in this case, the question of excessiveness is not so much whether the size of the verdict outrages the court's conscience, but whether the verdict is clearly beyond what ought to be reasonable compensation to the plaintiff in terms of uniformity and community expectations. In short, the court should not allow verdicts which are far above the average in similar cases to stand. I do not disregard the effect of inflationary medical expenses, or the cost of care which would have had to be administered to Miner who was virtually a paraplegic. Nevertheless, the court, as an exercise of public policy, must control verdicts within flexible limits, but limits there must be (cf *Fried v New York, New Haven & Hartford R. R. Co.,* 183 App Div 115, 125, affd 230 NY 619; *Hand v Penn Cent. Transp. Co.,* 35 AD2d 942, affd 29 NY2d 911; *Weadock v Eagle Ind. Co.,* 15 So 2d 132 [La.]). In a case lately decided in our court, when the injuries of the plaintiff resulted in a condition similar to that in which Miner found himself, we reduced a verdict of $1,600,000 to $750,000 *(Amaro v City of New York,* 47 AD2d 625). It is my judgment that under the circumstances here, a fair recovery would, upon Edward Miner's cause of action, be $850,000. Unless the plaintiff administratrix will stipulate to accept a reduction of the verdict thereon to $850,000. I would accordingly grant a new trial on that cause as to damages alone. Cohalan, J., not voting.